UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FBO STEPHEN N. CONRAD PERSHING LLC AS CUSTODIAN ROLLOVER ACCOUNT, Individually and on Behalf of All Others Similarly Situated, | No. |
| | **CLASS ACTION** |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| KIT DIGITAL, INC., KALEIL TUZMAN, ROBIN SMYTH, and GAVIN CAMPION, | |
| Defendants. | |

Plaintiff FBO Stephen N. Conrad Pershing LLC As Custodian Rollover Account ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kit digital Inc. ("KIT" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased KIT securities between November 9, 2011 and

May 2, 2012, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      KIT is a global provider of on-demand, Internet Protocol (IP)-based video asset management solutions.  The Company's end-to-end software platform, enables enterprise clients to acquire, manage and distribute video assets across personal computers, mobile devices, and IPTV-enabled television sets.

3.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company lacked appropriate financial personnel with understanding of U.S. Generally Accepted Accounting Principles ("GAAP") to ensure proper financial reporting; (ii) the Company overstated the effectiveness of its integration of acquired companies; (iii) the Company failed to report the true costs of several of its acquisitions, including the cost of proper administration and integration into the Company; (iv) the Company had materially overstated its foreseeable growth and profitability; (v) the Company lacked adequate internal and financial controls; and (vi) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

4.      On March 23, 2012, the Company disclosed the resignation of its Chief Executive Officer and four directors from its Board of Directors including the independent director who resigned "because of differences of opinion with other members of the Board over issues related to the Company's operations, policies and management."

5.      On this news, KIT shares fell $1.82 per share or 22%, to close at $6.33 per share on March 23, 2012.

6.      On May 2, 2012, *The Wall Street Journal* published an article that concluded that Defendant Kaleil Tuzman had "left a mess" at the Company, which the new Chief Executive Officer "may have a tough time cleaning up."

7.      On this news, KIT securities fell $1.92 per share or more than 30%, to close at $4.42 per share on May 3, 2012.

8.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

<u>JURISDICTION AND VENUE</u>

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

11.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as KIT's principal place of business is located within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

<u>PARTIES</u>

3

13.     Plaintiff, as set forth in the attached Certification, purchased KIT securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant KIT is a Delaware corporation with principal executive offices located at 26 West 17th Street, 2nd Floor, New York, New York 10011. KIT's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "KITD."

15.     Defendant Kaleil Tuzman ("Tuzman") has served as the Company's Chairman of the Board of Directors from January 2008 through April 11, 2012. Defendant Tuzman was the Company's Chief Executive Officer ("CEO") from January 2008 through March 23, 3012.

16.     Defendant Robin Smyth ("Smyth") was, at all relevant times, the Chief Financial Officer and Chief Accounting Officer of KIT. Defendant Smyth has served as a Director of KIT from 2003 through March 23, 2012.

17.     Defendant Gavin Campion ("Campion") was, at all relevant times, the Company's President. Defendant Campion served as a Director of the Company from 2008 through March 23, 2012.

18.     The defendants referenced above in ¶¶ 15 through 17 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     KIT is a premium provider of end-to-end video management software and services. The KIT Video Platform, a cloud-based video asset management system, enables clients in the enterprise, media and entertainment and network operator markets to produce, manage and deliver multiscreen social video experiences to audiences wherever they are. Kit services approximately 2,450 clients in more than 50 countries including some of the world's

biggest brands such as Airbus, AT&T, The Associated Press, BBC, Best Buy, Bristol-Myers

Squibb, BSkyB, Disney-ABC, FedEx, Google, HP, MTV, News Corp, Telecom Argentina,

Telefonica, Universal Studios, Verizon, Vodafone and Volkswagen.

### Materially False and Misleading
### Statements Issued During the Class Period

20.     On November 9, 2011, KIT issued a press release announcing its financial results

for the third quarter ended September 30, 2011.  For the third quarter, the Company reported net

income of $4.8 million, or $0.11 diluted earnings per share ("EPS") and net revenue of $62.3

million, as compared to a net loss of $8 million or ($0.34) diluted EPS and net revenue of $27.79

million for the same period a year ago.

21.     On November 9, 2011, the Company filed a quarterly report for the period ended

September 30, 2011 on Form 10-Q with the SEC, which was signed by, Defendants Tuzman and

Smyth, and reiterated the Company's previously announced quarterly financial results and

financial position.  In addition, the Form 10-Q contained signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Tuzman and Smyth, stating that the

financial information contained in the Form 10-Q was accurate and that they disclosed any

material changes to the Company's internal control over financial reporting.

22.     On November 17, 2011, the Company issued a press release entitled, "KIT digital

Reports Strong Customer Satisfaction Results Pointing to Growth in 2012."  The press release

stated the following in relevant part:

> According to Kaleil Isaza Tuzman, chairman and CEO, KIT digital: "KIT digital
> meets the diverse needs of its customers with a set of solutions that can transform
> the world's most complex, top-tier deployments into a seamless, integrated video
> ecosystem. We continue to execute on our vision to power the global
> transformation of traditional broadcast to multiscreen broadband TV. It's exciting
> to see that vision validated by our customers, as well as by recognized analyst
> firms like IDC."

KIT digital is being recognized from multiple angles as a leader within the IP-based video software space, based on its offering of a diverse set of solutions that cater to Tier 1 customers in multiple industries, and for its aggressive, rapid growth on a global scale. The company reported last week record third quarter earnings with revenue of $62.3 million, an increase of 124% when compared to the same quarter last year. The company also crossed the threshold to GAAP profitability.

23.     On November 28, 2011, the Company issued a press release reaffirming its annual guidance for 2012.  The press release stated the following in relevant part:

**Financial Guidance and Eurozone Commentary**

KIT digital reiterated Q4 2011 guidance of at least $67 million in revenue, EBITDA of approximately $17.5 million and adjusted, or cash, earnings per share (EPS) of $0.33. The company expects to generate at least $2.5 million in free cash flow per month starting in December 2011.

The company also reaffirmed its guidance for 2012, including at least $300 million in revenue and at least $1.45 in adjusted, or cash, EPS, with EBITDA margins expected to reach close to 30% by year-end 2012. KIT digital emphasized it retains an overall "positive bias" regarding its 2012 guidance, which it plans to revisit early next year. KIT also confirmed it expects to remain GAAP net income positive going forward.

"The market is strong for IP-delivered video and over-the-top premium content, and we have become the leading enabler of these 'TV Everywhere' services for telcos, cable operators and major media companies globally," commented Gavin Campion, president of KIT digital. "While we are obviously aware of the general anxiety around the Eurozone, we benefit from the video technology industry's long-term transition towards OTT content delivery and cloud-based services. Our financial performance has not been affected, and we do not anticipate it will be affected by European macroeconomic and political turbulence. In fact, we have thrived and grown market share through even more turbulent times in 2008-2009, and believe there will be a flight to quality as customers shift their spend to KIT digital versus smaller, underfunded competitors."

24.     On January 6, 2012, the Company issued a press release discussing the acquisition of Sezmi Corporation and providing its outlook for the fiscal year of 2012.  The press release stated the following in relevant part:

KIT digital closed 2011 with strong operating and financial momentum. Based on preliminary unaudited information, KIT digital management expects to deliver on its previously provided fourth quarter 2011 guidance, including positive free cash flow in December of at least $2.5 million. KIT digital plans to report preliminary Q4 2011 financial results in February.

"2011 was a milestone year for KIT digital," said the company's chairman and CEO, Kaleil Isaza Tuzman. "We generated organic top-line growth of more than 30% year-over-year, and achieved our free cash flow and GAAP net profitability targets before year-end. As we begin 2012, we are focused on building upon our leadership position in the IP video market in a manner that generates growing and measurable per-share cash returns."

\*\*\*

In reference to KIT digital's overall acquisition strategy, Isaza Tuzman added: "As we stated on our Q3 2011 earnings call in November, our normal course of business will continue to emphasize organic growth, while we will be opportunistic and highly discerning in evaluating accretive, complementary acquisitions. We are pleased to have been in a position to complete this acquisition in such a way that improves both our technology and cash-generation profile, while creating long-term value for shareholders."

\*\*\*

Management Increases 2012 Financial Guidance
Given the close of the Sezmi transaction, KIT digital management adjusted its 2012 financial guidance. The company now expects revenues of at least $320 million (as compared to $300 million previously) and adjusted, or cash EPS of at least $1.53 (versus $1.45 previously). The increase in adjusted EPS guidance reflects the accretive Sezmi acquisition, and is inclusive of anticipated restructuring and integration costs.

KIT digital continues to project an organic growth rate for 2012 of at least 25%, driven by growth in existing client revenues and the addition of new customers. The company has not experienced a slowdown in its business related to Eurozone macroeconomic turbulence and reiterates a "positive bias" towards its current and revised 2012 guidance.

25.     On February 27, 2012, the Company issued a press release announcing preliminary financial results for the fourth quarter and fiscal year ended December 31, 2011. The press release stated the following in relevant part:

7

Based on preliminary unaudited information, KIT digital management expects to report record revenue for the fourth quarter of 2011 of approximately $70 million. This would exceed the company's guidance by approximately $3 million, and represent a 12% increase from the previous quarter and 82% versus the fourth quarter of 2010. Non-GAAP operating income (previously called operating EBITDA in the company's guidance) in the fourth quarter is expected to be approximately $16.4 million versus guidance of $17.5 million, representing an increase of 15% sequentially and 145% over the fourth quarter of 2010. Cash-based adjusted EPS (a non-GAAP metric) for the fourth quarter of 2011 is expected to be approximately in line with the company's guidance of $0.33. KIT digital management also expects to meet its guidance for positive free cash flow in December 2011 of at least $2.5 million.

"The organic growth in our business is reflected in these preliminary record results," said KIT digital's chairman and CEO, Kaleil Isaza Tuzman. "The quarter's non-GAAP operating income is expected to come in marginally lower than originally targeted, due to increased internal staffing and third-party resources for additional tier 1 deployments in the quarter. However, we were pleased with the bottom-line results, and the investments we are making now add to our conviction that we have set the stage for a strong 2012 and beyond. We grew organically at an annualized rate of over 50% in the fourth quarter and won tier 1 network-operator and media client deals in all three of our regions -- some of which we have yet to announce."

***

Revenue of $70 million for the fourth quarter of 2011 represents a sequential increase of 12% from the previous quarter and an increase of 82% from the fourth quarter of 2010. Revenue for the full year of 2011 is expected to be approximately $215 million, up 102% from 2010.

***

For the first quarter of 2012, KIT digital expects revenues of at least $72 million. This guidance reflects strong demand, given the historically flat-to-downward industry seasonality in Q1 over Q4 and the fact that revenue contributions from the company's acquisition of Sezmi Corporation on December 30, 2011 are not expected to ramp up meaningfully until the latter half of 2012. Cash-based adjusted EPS is expected to be between $0.25 and $0.30 in Q1 2012, depending on the timing of certain investments as described below.

KIT digital management also updated its 2012 guidance, and currently expects revenue of $320 million to $330 million, as compared to $320 million previously. This guidance represents an organic annual growth rate of more than 25% when assuming full year 2011 contributions for the acquisitions of KickApps, Kyte, Kewego, WWB, ioko, Polymedia and Sezmi.

26.     On March 15, 2012, the Company issued a press release announcing financial results for the fourth quarter and year ended December 31, 2011.  For the fourth quarter, the Company reported net income of $2.2 million or $0.05 diluted EPS and revenue of $70 million, as compared to net income of $8 million, or $0.31 diluted EPS and revenue of $38 million for the same period a year ago.  For the year, the Company reported a net loss of $25.4 million or ($0.61) diluted EPS and revenue of $215 million, as compared to net loss of $35 million or ($1.63) diluted EPS and revenue of $106.6 million for the same period a year ago.

27.     The statements referenced in ¶¶ 20-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company lacked appropriate financial personnel with understanding of GAAP to ensure proper financial reporting (ii) the Company overstated the effectiveness of its integration of acquired companies; (iii) the Company failed to report the true costs of many of its acquisitions, including the cost of proper administration and integration into the Company; (iv) the Company had materially overstated its foreseeable growth and profitability; (v) the Company lacked adequate internal and financial controls; and (vi) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

28.     On March 23, 2012, the Company filed a Form 8-K with the SEC disclosing that Defendant Tuzman resigned as its CEO.  The Company also disclosed that the resignations of four Directors including Defendants Campion and Smyth.  Further, the Company revealed Santo Politi, the independent director resigned from the Board "because of differences of opinion with

other members of the Board over issues related to the Company's operations, policies and management."

29.      On this news, KIT shares fell $1.82 per share or 22%, to close at $6.33 per share on March 23, 2012.

30.      On March 30, 2012, the Company filed an annual report on a Form 10-K for the year ended December 31, 2011 with the SEC, which was signed by, among others, Defendants Tuzman and Smyth, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Tuzman and Smyth, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

31.      The 10-K also disclosed the following material weakness in the Company's internal controls over financial reporting:

> As described below, a material weakness was identified in our internal control over financial reporting due to lack of finance personnel with understanding of US GAAP to ensure that all transactions were reported in accordance with US GAAP on a timely basis. The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. As a result of the material weakness, our chief executive officer and chief financial officer have concluded that, as of December 31st 2011, the end of the period covered by this report, our disclosure controls and procedures were ineffective at a reasonable assurance level. Notwithstanding the material weakness discussed below, our management, including our Chief Executive Officer and Chief Financial Officer, has concluded that the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States.

***

Based on management's assessment including consideration of the control deficiencies discussed below, management has concluded that the company's internal control over financial reporting was ineffective as of December 31, 2011. A material weakness was identified in its internal control over financial reporting related to the lack of US GAAP trained finance personnel in the regional and local offices responsible for providing monthly financial information for US GAAP consolidated financial statements. There were not enough qualified resources at corporate to review and ensure that all transactions were reported in accordance with US GAAP on a timely basis.

32.     The Form 10-K also included a report by the Company's Independent Registered

Public Accounting Firm, Grant Thornton LLP ("Grant").  In the report, Grant concluded that:

> The Company does not currently have sufficient accounting personnel with an adequate understanding of US GAAP to timely review and ensure that all transactions were reported in accordance with US GAAP
>
> ***
>
> In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, KIT digital, Inc. and Subsidiaries has not maintained effective internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control— Integrated Framework* issued by COSO.

33.     On April 16, 2012, the Company announced in a Form 8-K, the resignation of

Defendant Tuzman as the Company's Chairman "due to the disagreements described in" his

resignation letter.  The letter stated the following in relevant part:

> As you know, I have not always agreed with other members of the Board of Directors (the "Board") or, specifically, with all of the decisions or processes followed by the Strategic Transaction Committee of the Board with reference to the current strategic sale process. Although I will no longer be a member of the Board, I intend to stay involved as a shareholder of the Company, and I will also have greater flexibility to independently consider other strategic alternatives for the Company. I also think my departure from a formal role with the Company will give the Company greater flexibility to evolve in its next, post-consolidation stage of development independent of my personality and role as a founder.

34.    On May 2, 2012, after the market closed, *The Wall Street Journal* published an article that concluded that Defendant Tuzman had "left a mess" at the Company and the new CEO would not endorse guidance.  The article stated the following:

> Kaleil Isaza Tuzman left a mess at KITD Digital that his successor, Barak Bar-Cohen, may have a tough time cleaning up. Among Mr. Bar-Cohen's first big moves may be to backtrack on the financial projections made to shareholders.

> "You won't hear me reiterate guidance," Mr. Bar-Cohen, KIT's new chief executive, told The Wall Street Journal on Tuesday. He said he plans to reset the bar on financial results he believes the company can achieve in the future.

> Mr. Tuzman was the star of "Startup.com," a documentary that followed the rise and fall of one of his previous ventures. At KIT, he acquired 19 companies in an effort to create an online video technology powerhouse. Since 2009, KIT has raised $268 million via stock sales to help fund the deals. The company enjoyed positive stock recommendations from some Wall Street analysts whose firms also sponsored those stock sales. But KIT didn't properly integrate the acquisitions or put the necessary corporate structure in place to handle its own growth.

> In its latest annual financial filing, KIT's auditor said the company is short of accounting personnel to review its transactions, citing a material weakness in internal controls. Indeed, KIT filed the document late due to questions about the valuation of past acquisitions.

> KIT has also had trouble tracking cash in the bank. When it reported fourth-quarter results, KIT said it had $47.8 million of cash as of Dec. 31. Two weeks later, in the annual filing, it said the figure was $45.7 million. And cash may take a further hit. The company is in violation of a debt covenant that says it must keep 75% of its cash in the U.S. To comply, it may have to repatriate cash, incurring taxes.

> Mr. Tuzman is himself facing scrutiny from the SEC over stock trades from June 2010. It sent subpoenas to Mr. Tuzman and the company in February.

> On March 18, one of KIT's independent directors resigned from the board over disagreements regarding the company's direction. Three other directors resigned from the board four days later, and Mr. Tuzman stepped down as CEO the day after that. Still the company's top shareholder, Mr. Tuzman remained board chairman until he resigned on April 11.

> Mr. Bar-Cohen said he would like to "control-alt-delete the past." He is determining which parts of KIT's business to shutter, recruiting accounting staff

and new board members while trying to win new customers. But the "Kaleil factor," as he calls it, could take a while to leave behind.

35.     On May 3, 2012, the Company disclosed preliminary financial results for the first quarter ended March 31, 2012.  The Company disclosed the following in relevant part:

> Based on preliminary unaudited information, KIT digital management expects to report revenue for the first quarter of 2012 of approximately $59 million, and a non-GAAP operating loss in the first quarter of 2012 of approximately $8 million.

> Contributing to the lower than expected financial results, the company cited longer than anticipated sales cycles for a number of larger opportunities, increased personnel costs associated with deployments in future quarters, payments of assumed liabilities arising from the acquisition of Sezmi, and higher than expected legal and advisory fees, among other factors.

> "Over the last several weeks, the management team and I have performed a detailed review of our lines of business and their cash flow contributions, and have determined that previous guidance was too high," said Barak Bar-Cohen, KIT digital's CEO. "During our quarterly earnings call, we will present a revised operating plan and financial outlook for a growing, cash-generative software business."

36.     On this news, KIT shares plummeted $1.92 per share or more than 30%, to close at $4.42 per share on May 3, 2012.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired KIT securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, KIT securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by KIT or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of KIT;

- whether the Individual Defendants caused KIT to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

14

- whether the prices of KIT securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

43.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- KIT securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold KIT securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

44.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

15

## COUNT I

### (Against All Defendants for Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of KIT securities; and (iii) cause Plaintiff and other members of the Class to purchase KIT securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for KIT securities.  Such reports, filings, releases and statements were

16

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about KIT's finances and business prospects.

49.     By virtue of their positions at KIT, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

50.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of KIT securities from their personal portfolios.

51.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of KIT, the Individual Defendants had knowledge of the details of KIT's internal affairs.

52.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of KIT.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to KIT's businesses,

operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of KIT securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning KIT's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased KIT securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

53.     During the Class Period, KIT securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of KIT securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of KIT securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of KIT securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

54.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)**

56.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     During the Class Period, the Individual Defendants participated in the operation and management of KIT, and conducted and participated, directly and indirectly, in the conduct of KIT's business affairs.  Because of their senior positions, they knew the adverse non-public information about KIT's misstatement of income and expenses and false financial statements.

58.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to KIT's financial condition and results of operations, and to correct promptly any public statements issued by KIT which had become materially false or misleading.

59.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which KIT disseminated in the marketplace during the Class Period concerning KIT's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause KIT to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of KIT within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of KIT securities.

60.     Each of the Individual Defendants, therefore, acted as a controlling person of KIT.  By reason of their senior management positions and/or being directors of KIT, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, KIT to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of KIT and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

61.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by KIT.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 13, 2012

Respectfully submitted,

**POMERANTZ HAUDEK
GROSSMAN & GROSS, LLP**

By: _____
Marc I. Gross
Jeremy A. Lieberman
Fei-Lu Qian
100 Park Avenue - 26th Floor
New York, New York 10017-5516
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
jalieberman@pomlaw.com
flqian@pomlaw.com

**POMERANTZ HAUDEK
GROSSMAN & GROSS, LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street - Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**VITA LAW OFFICES, P.C.**
Richard J. Vita
77 Franklin Street
Boston, MA 02110
Telephone: (617) 426-6566
Facsimile: (617) 249-2119
rjv@vitalaw.com

**Attorneys for Plaintiff**

21